SORONDO, Judge.'
Appellee/Plaintiff, North Shore Medical Center, Inc. (North Shore) filed suit against Olga Garcia (Garcia) and her health insurer, Century Medical Health Plan, Inc., n/k/a PCA Family Health Plan, Inc. (PCA) for services rendered. North Shore settled with Garcia who admitted that she owed the money the hospital claimed was due. She agreed to pay back the money on an installment plan. North Shore received an assignment of insurance benefits from Garcia and filed same in this cause. North Shore filed a motion for summary judgment against PCA which the trial court granted. Final Summary judgment was entered against PCA in the amount of $19,896.75. PCA appeals.
The facts of the case are not in dispute. PCA is a health maintenance organization. Garcia became a member of the HMO in 1990. Her contract with PCA excluded certain types of coverage, specifically:
1. All services not specifically listed in this Contract ... complications arising for or associated with medical care or surgery which is not covered under the Contract ...
5. Cosmetic, medical, or surgical procedures except reconstructive surgery necessary to correct a functional disorder ... The exclusions to the extent not Medically Necessary include: surgical excision or reformation of any sagging skin ... any services performed in connection with the enlargement, reduction ... or change in appearance in a portion of the body including, ... the ... face, lips, jaw, chin, nose ... or any other surgical or non-surgical procedures which are primarily for cosmetic purposes (emphasis added).
In February 1993, Garcia underwent elective, cosmetic surgery to her neck, eyes, and nose. The surgery was performed at the surgeon’s office and Garcia paid for it herself. At the conclusion of the surgery, Garcia' suffered acute pulmonary edema and was transported to North Shore.
PCA argues that the cosmetic surgery that Garcia submitted herself to is not covered by the insurance contract and that the complications she suffered as a result of that surgery are also excluded from coverage.[1] North Shore responds to this defense by asserting that the contract of insurance between PCA and Garcia is vague in its definition of “emergency care.” Specifically, North Shore directs our attention to the following sections of the contract:
Bona fide Emergency Care services provided after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in: (1) placing the patient’s health in serious jeopardy; (2) serious impairment to bodily functions; or (3) serious dysfunction of any bodily organ or part. Heart attacks, poisonings, loss of consciousness or respiration, convulsions, excessive uncontrolled bleeding and broken bones are examples of conditions requiring Emergency Care.
Because Garcia was brought to the hospital in a life threatening condition, North Shore submits that she needed emergency care as defined by the contract. Additionally, North Shore argues that Section XI of the contract, Part C, states that emergency care services are covered services and that the costs of *979 such services are to be reimbursed to Garcia. This section of the contract reads as follows:
C. Emergency Care Services
1.Inside the Service Area. In the case of need for Emergency Care ... inside the Service Area, the Member, should call or visit their Participating Primary Care Provider for assistance if possible. The Primary Care Provider will assist the Member in obtaining Emergency Care Services.
Emergency Care services obtained through Non-Participating Physicians and Non-Participating Hospitals are covered provided the incident requiring care constitutes the need for Emergency Care as defined in this contract. Health Plan will pay for, or reimburse Members for, costs incurred for Covered Services, subject to the payment and reimbursement provisions set out in Section IV of this Contract (emphasis added).
North Shore insists that these sections are ambiguous and must therefore be interpreted against the insurer. Firemans Fund v. Boyd, 45 So.2d 499 (Fla.1950); New York Life Ins. Co. v. Bird, 152 Fla. 532, 12 So.2d 454 (1943). We do not agree.
We do not perceive these sections of the contract to be as ambiguous as North Shore suggests. Indeed, we find them to be rather specific. More significant, however, is the fact that North Shore complains about a section that obviously does not apply to it. Section C, the allegedly ambiguous and consequently misleading section of the contract, clearly applies only to “Non-Participating” physicians and hospitals. North Shore has a well defined relationship with PCA and qualifies as a “Participating” hospital. Thus, if there were an ambiguity in this section, it would be of no concern to North Shore.
We reverse the Final Judgment entered below and remand with instructions that Final Summary Judgment be entered in favor of PCA.
Reversed.

. PCA asserted a total of eleven affirmative defenses. Because we find this one to be disposi-five, we do not address the others.